[Cite as *In re D.F.*, 2023-Ohio-4301.]

STATE OF OHIO　　　　　)　　　　　IN THE COURT OF APPEALS
　　　　　　　　　　　　　)ss:　　　　NINTH JUDICIAL DISTRICT
COUNTY OF MEDINA　　　)

IN RE: D.F.　　　　　　　　　　　　　　C.A. Nos.　23CA0021-M
　　　　H.F.　　　　　　　　　　　　　　　　　　　　23CA0025-M


　　　　　　　　　　　　　　　　　　　　APPEAL FROM JUDGMENT
　　　　　　　　　　　　　　　　　　　　ENTERED IN THE
　　　　　　　　　　　　　　　　　　　　COURT OF COMMON PLEAS
　　　　　　　　　　　　　　　　　　　　COUNTY OF MEDINA, OHIO
　　　　　　　　　　　　　　　　　　　　CASE Nos.　2020 01 AB 0008
　　　　　　　　　　　　　　　　　　　　　　　　　　2020 01 DE 0007


DECISION AND JOURNAL ENTRY

Dated: November 29, 2023


SUTTON, Presiding Judge.

{¶1}　Appellant, N.F. ("Mother"), appeals from a judgment of the Medina County Court of Common Pleas, Juvenile Division, that placed two of her minor children in the permanent custody of Medina County Job and Family Services ("MCJFS"). This Court affirms.

I.

{¶2}　Mother is the biological mother of D.F., born February 3, 2018; and H.F., born October 28, 2011. Mother has four older children who are not parties to this appeal. The father of D.F. and H.F. ("Father") was not actively involved in the trial court proceedings and did not appeal the permanent custody judgment.

{¶3}　Mother is intellectually disabled and has a lengthy history of domestic violence, sexual abuse, untreated mental health problems, and instability in her life. She has an extensive history with children service agencies in other counties both as a child and as an adult. Few details

about Mother's prior cases are included in this record. Mother's four older children were removed from her custody over a period of several years by children services agencies outside of Medina County. Each child was ultimately permanently placed outside Mother's custody.

{¶4} On January 13, 2020, MCJFS received a referral about this family after D.F. came to school with a sore and swollen arm and visible bruises on his upper body. D.F. told school personnel that Mother had hit him for stealing $5.00. Mother was interviewed and admitted that she had hit the child, and police removed both children from the home pursuant to Juv.R. 6. MCJFS filed complaints the next day to allege that D.F. was abused, neglected, and dependent and that H.F. was dependent. Although Mother was initially charged with domestic violence for hitting D.F. and breaking a bone in his upper body[1], she later entered a guilty plea to child endangering.

{¶5} Mother agreed to waive her right to an adjudicatory hearing. The juvenile court adjudicated D.F. as an abused child and H.F. as a dependent child. The court later placed both children in the temporary custody of MCJFS and adopted the case plan as an order of the court.

{¶6} Because the children had been exposed to ongoing domestic violence in their home, the case plan required MCJFS to provide them with therapeutic treatment for the trauma they had endured. In counseling, the children revealed that they had been exposed to significant trauma in Mother's home. In addition to both children experiencing ongoing verbal and physical abuse by Mother and witnessing domestic violence between Mother and Father, H.F. disclosed that she had been sexually abused by Father. H.F. also suffered significant trauma when she intervened in a suicide attempt by Mother and pulled a knife from Mother's hand. H.F. had apparently spent much of her life caring for Mother and D.F. and required extensive counseling to address her parentified

---

[1] It is unclear from the record whether Mother broke the child's arm, shoulder, or collar bone.

behavior. During this case, although engaged in counseling, each child was removed from foster home placements because of their behavioral problems and were later placed in separate residential treatment facilities.

{¶7} Mother's goals on the case plan initially focused on her ongoing problem with violence in the home. Mother was ordered to obtain a dual substance abuse and mental health assessment and follow all recommendations; participate in anger management and domestic violence counseling; maintain stable income; and obtain and maintain a home that was free from substance abuse, domestic violence, criminal activity, or occupants not approved by MCJFS. Ultimately, the case plan required Mother to demonstrate that she could provide the children with a safe and stable home.

{¶8} Mother completed her mental health and substance abuse assessment with a licensed psychologist. The psychologist evaluated Mother's intellectual ability and concluded that Mother has a verbal IQ of 77 and a nonverbal IQ of 60. She explained that, although Mother can read at the level of a fifth grader, her problem-solving ability is at the level of a six-year-old child. Mother's low nonverbal IQ was particularly concerning to the evaluator because Mother lacks the ability to learn how to appropriately cope with problems, which likely cannot be overcome through counseling.

{¶9} The psychologist believed that Mother was open and honest with her during the assessment. Mother reported that, as a child, she was physically and sexually abused by her father and stepfather over a period of years and, for that reason, she felt paranoid all the time. The psychologist diagnosed Mother with post-traumatic stress disorder ("PTSD") and expressed concern that Mother's PTSD and other mental health problems had gone untreated for most of her life. Instead, Mother had been self-medicating with regular marijuana use since she was a young

teenager. The psychologist explained that Mother's use of marijuana likely only exacerbated her feelings of paranoia.

{¶10} Although Mother had repeatedly been offered case plan services as a child and an adult, she had never engaged in any meaningful mental health treatment. Consequently, Mother had not broken the ongoing cycle of domestic violence in her life. As an adult, Mother admitted that she was usually unable to control her emotions and used screaming, berating language, and physical punishment as the means to discipline her children. Mother also continued to involve herself in relationships with abusive men and allow them to stay in her home.

{¶11} The psychologist also diagnosed Mother with bipolar disorder, with extended episodes of mania or depression; borderline personality disorder; and cannabis use disorder. Mother reported to her that, while not taking psychiatric medication, her anger could quickly escalate from zero to 100 and that she often "blacked out" in anger. Mother informed the psychologist that she felt overwhelmed parenting her children and that she lacked a support system of suitable adults to assist her in her parenting duties.

{¶12} Because Mother had reported other symptoms, including periods of auditory and visual hallucinations, the psychologist recommended that Mother should be evaluated more thoroughly through comprehensive mental health treatment, including specific components set forth in her report. As the psychologist would later explain, Mother could improve the symptoms of her mental illnesses through ongoing treatment, but she was significantly impaired by her intellectual disability, her multiple mental health diagnoses, and her extensive history of untreated trauma. She expressed doubt that Mother could significantly improve her parenting ability through case plan services.

{¶13} During the following year, Mother engaged in case plan services, but she missed a significant number of her scheduled weekly counseling appointments. According to one of her counselors, Mother was receptive and cooperative in their sessions, seemed to understand the coping strategies the counselor suggested to regulate her moods and behavior, but she had trouble implementing those strategies in her daily life.

{¶14} Mother also tested positive for cocaine or marijuana several times during this case. Each time, Mother denied that she had taken drugs, despite the samples being repeatedly tested to rule out false positives. Mother submitted a hair sample, which tested negative for drugs. Although the hair follicle test ruled out regular drug use, MCJFS remained concerned that Mother was using drugs to regulate her emotions even occasionally.

{¶15} The agency was also concerned that Mother continued to allow adults into her home who engaged in criminal activity and domestic violence. The police were called to Mother's home on multiple occasions. MCJFS was concerned that Mother knew very little about some of these people and, despite engaging in counseling to learn how to set boundaries and protect herself, she lacked the ability to keep unwanted individuals out of her home.

{¶16} MCJFS eventually moved for permanent custody of D.F. and H.F., alleging that permanent custody was in the children's best interest, and that it was entitled to permanent custody based on the "12 of 22" grounds set forth in R.C. 2151.414(B)(1)(d) and for several alternative reasons under R.C. 2151.414(B)(1)(a) and R.C. 2151.414(E). Following a three-day hearing, the trial court terminated parental rights and placed D.F. and H.F. in the permanent custody of MCJFS.

{¶17} Mother appeals and raises two assignments of error. H.F. also filed a brief on appeal. Because H.F. did not file a notice of appeal in this case, this Court will construe the child's

brief as a brief filed by an appellee in support of Mother's brief. *See In re A.T.*, 9th Dist. Summit No. 28220, 2016-Ohio-5907, ¶ 10.

II.

<strong><u>ASSIGNMENT OF ERROR I</u></strong>

> THE TRIAL COURT'S DECISION TO TERMINATE PARENTAL RIGHTS WAS NOT SUPPORTED BY CLEAR AND CONVINCING EVIDENCE AND WAS AGAINST THE MANIFEST WEIGHT OF THE EVIDENCE.

{¶18} Mother's first assignment of error is that the trial court's permanent custody decision was not supported by the evidence presented at the final hearing. Before a juvenile court may terminate parental rights and award permanent custody of a child to a proper moving agency, it must find clear and convincing evidence of both prongs of the permanent custody test: (1) that the child is abandoned; orphaned; has been in the temporary custody of the agency for at least 12 months of a consecutive 22-month period; the child or another child of the same parent has been adjudicated abused, neglected, or dependent three times; or that the child cannot be placed with either parent, based on an analysis under R.C. 2151.414(E); and (2) that the grant of permanent custody to the agency is in the best interest of the child, based on an analysis under R.C. 2151.414(D)(1). R.C. 2151.414(B)(1) and 2151.414(B)(2); *see also In re William S.*, 75 Ohio St.3d 95, 98-99 (1996). Clear and convincing evidence is that which will "produce in the mind of the trier of facts a firm belief or conviction as to the facts sought to be established." (Internal quotations omitted.) *In re Adoption of Holcomb*, 18 Ohio St.3d 361, 368 (1985), quoting *Cross v. Ledford*, 161 Ohio St. 469 (1954), paragraph three of the syllabus.

{¶19} In considering whether the juvenile court's judgment is against the manifest weight of the evidence, this Court "weighs the evidence and all reasonable inferences, considers the credibility of witnesses and determines whether in resolving conflicts in the evidence, the [finder

of fact] clearly lost its way and created such a manifest miscarriage of justice that the [judgment] must be reversed and a new [hearing] ordered." (Internal quotations and citations omitted.) *Eastley v. Volkman*, 132 Ohio St.3d 328, 2012-Ohio-2179, ¶ 20. When weighing the evidence, this Court "must always be mindful of the presumption in favor of the finder of fact." *Id*. at ¶ 21.

{¶20} The trial court found that the first prong of the permanent custody test was satisfied for numerous alternative reasons under R.C. 2151.414(B)(1)(a) and (B)(1)(d). Specifically, the trial court found that D.F. and H.F. had been in the temporary custody of MCJFS for at least 12 months of a consecutive 22-month period, and that the children could not be returned to Mother's home for seven alternative reasons under R.C. 2151.414(E): her failure to substantially remedy the conditions that caused the removal of the children from the home; her chronic mental illness, drug use, and intellectual disability prevents her from providing the children with an adequate home; her lack of commitment to the children; her conviction of child endangering against D.F.; her unwillingness to provide basic necessities for the children; her past abuse and/or neglect of the children that, because of the circumstances, was likely to reoccur and pose a risk to the children; and her pattern of repeated involvement in romantic relationships with abusive men. R.C. 2151.414(B)(1)(d); R.C. 2151.414(B)(1)(a); R.C. 2151.414(E)(1), (2), (4), (6), (14), (15), and (16).

{¶21} On appeal, Mother challenges only the trial court's findings that the children should not or could not be returned to her custody because she failed to substantially remedy the conditions that caused them to be placed outside the home and because her chronic mental health, substance abuse, and/or intellectual disability prevented her from providing them with a suitable permanent home. R.C. 2151.414(B)(1)(a); R.C. 2151.414(E)(1) and (2). She does not challenge any of the trial court's alternative findings under R.C. 2151.414(E), some of which explicitly focus on her abuse of D.F., the likelihood that she will abuse D.F. or H.F. in the future, and other reasons

that she is unable to provide her children with an appropriate home. For each of those reasons, the trial court was also required to "enter a finding that the child[ren] cannot be placed with either parent within a reasonable time or should not be placed with either parent[.]" R.C. 2151.414(E).

{¶22} Moreover, Mother does not challenge the first-prong finding that was obviously supported by the record: that the children had been in the temporary custody of MCJFS for at least 12 months of a consecutive 22-month period. R.C. 2151.414(B)(1)(d). For purposes of R.C. 2151.414(B)(1)(d), the children were considered to have entered the temporary custody of MCJFS on March 12, 2020, sixty days after the children were removed from the home. *See* R.C. 2151.414(B)(1) ("a child shall be considered to have entered the temporary custody of an agency on the earlier of the date the child is adjudicated * * * or the date that is sixty days after the removal of the child from home."). MCJFS moved for permanent custody on December 10, 2021, when the children had been in its temporary custody for more than 20 months of a consecutive 22-month period.

{¶23} Because the trial court was required to find only one first-prong ground for permanent custody, any error in its alternative findings would be harmless. *In re K.C.*, 9th Dist. Summit Nos. 29898 and 29899, 2021-Ohio-2489, ¶ 10. Therefore, this Court need not review the propriety of the trial court's alternative findings that the children cannot or should not be returned to Mother's custody because of the factors set for in R.C. 2151.414(E)(1) or (2).

{¶24} Next, the trial court was required to determine that permanent custody was in the best interest of the children. This Court's best interest review focuses primarily on the best interest factors set forth in R.C. 2151.414(D). *In re M.S.*, 9th Dist. Summit Nos. 30506 and 30515, 2023-Ohio-1558, ¶ 25. In making its best interest determination, the trial court was required to consider the statutory best interest factors, which include: the interaction and interrelationships of the child,

the wishes of the child, the custodial history of the child, the child's need for permanence and whether that can be achieved without a grant of permanent custody, and whether any of the factors outlined in R.C. 2151.414(E)(7)-(11) apply.[2] R.C. 2151.414(D)(1)(a)-(e); *see In re R.G.*, 9th Dist. Summit Nos. 24834 and 24850, 2009-Ohio-6284, ¶ 11.

{¶25} Mother's interaction with the children was limited to supervised visitation, which decreased in frequency during this case because of the children's own mental health problems. By the time of the hearing, both children were living in separate mental health treatment facilities due to the significance of their mental health symptoms and resulting behavioral problems.

{¶26} Mother visited consistently with H.F. throughout this case, even when H.F. relocated to a treatment facility in Columbus, but she was typically late for those visits. Mother and H.F. usually colored together during visits and were always happy to see each other. By the time of the final hearing, H.F. was still having supervised visits with Mother at her facility and the two had begun family counseling with H.F.'s counselor. The counselor testified that Mother had made little progress in family counseling and that they had not yet started to discuss any of the trauma that H.F. had experienced while living in Mother's home.

{¶27} H.F.'s counselor expressed particular concern that, at that point in time, H.F. continued to internalize her feelings and blame herself for everything that had happened to her, rather than placing the blame on Mother and the other people who had victimized her. The counselor opined that H.F. would need much more counseling to come to terms with her feelings, her ability to assert herself, and her ability to regulate her own aggressive behavior. The counselor did not believe that H.F. would be ready to have unsupervised contact with Mother any time soon.

---

[2] The trial court did not find that any of those provisions applied to the facts of this case.

{¶28} Mother did not consistently visit D.F., even when she was permitted to do so. Mother admittedly had a closer relationship with H.F. After D.F. was placed in a residential treatment facility, D.F.'s therapist reached out to Mother and asked her if she would like to receive reports about D.F.'s progress at the facility. Mother responded that she did not.

{¶29} Mother initially had visits with D.F. at the facility every two weeks, which was later reduced to once a month. By the time of the hearing, Mother's visits with D.F. had been suspended because, although D.F. was making significant progress in therapy, he was very apprehensive about seeing Mother, had frequent nightmares about her hurting him, and talked about her abusing him "all the time."

{¶30} By the end of the final hearing, D.F. had moved from the residential treatment facility to a therapeutic foster home. According to his residential therapist, D.F. had prepared to transition to that home by meeting the family several times and having one extended weekend visit in their home. D.F. was happy in the home and was assimilating into the family.

{¶31} The wishes of the children aligned with the roles that they had assumed while in Mother's custody. D.F. occasionally stated that he wanted to go home, but his counselor explained that he typically wanted to go home when he was nervous about making a transition within the facility or to the therapeutic foster home. Most often, D.F. said that he did not want to see Mother and referred to her as a "monster" and a "troubled person" because of her angry outbursts and inappropriate methods of disciplining him. D.F. was not interested in seeing Mother or talking to her on the phone.

{¶32} H.F. consistently insisted that she wanted to go home to live with Mother. Her counselor explained, however, that H.F. felt the need to take care of Mother and worried about what would happen to her without H.F. helping her. The counselor explained unequivocally that

H.F. and Mother had not begun to address the problems in their family relationship and were not emotionally prepared to live together.

{¶33} The guardian ad litem had initially supported the agency's request for permanent custody but, by the end of the hearing, he recommended that D.F. should be placed in the agency's permanent custody, but that H.F. should be returned to Mother's custody. The trial judge explicitly disagreed that returning H.F. to the home was in the best interest of the child.

{¶34} The trial judge's reluctance to accept that recommendation was supported by the testimony of the guardian ad litem, which was clearly slanted in favor of Mother's efforts to retain her parental rights, rather than on protecting H.F. from the risk of future harm. For example, he testified that he had a more positive outlook on this case than MCJFS and that he tended to believe what Mother had told him, including that she had removed all inappropriate adults from her home, and that he had "no reason to believe that they're not gone."

{¶35} Significantly, the guardian's recommendation to return H.F. to Mother's custody seemed to hinge on the fact that Mother had tried to comply with the case plan. "What's the point of the case plan if you're not going to give her credit for trying, trying to get better?" He thought that "it's worth a shot to see if Mom has improved." Emphasizing that there are no guarantees about one's future behavior, he stated that "I don't know if [Mother's] capable of recognizing the danger concept in the future until we have an opportunity to find out."

{¶36} The trial judge reasonably rejected the recommendation to return H.F. to Mother's custody to see whether Mother was up to the challenge. The overwhelming evidence before the trial court demonstrated that she was not. H.F. had suffered significant trauma while in Mother's home, she and Mother had a dysfunctional parent-child relationship, and both would need far more

counseling to remedy the serious problems in their relationship. Mother also continued to allow inappropriate adults into her home, which posed an additional risk to the safety of H.F.

{¶37} The custodial history of the children also supported the trial court's decision. Before this case began, both children had lived in Mother's custody and were subjected to ongoing verbal and physical abuse by Mother and exposed to domestic violence between Mother and her partners, as well as other behavioral symptoms of Mother's untreated mental illness. H.F. was also exposed to sexual abuse by her father and had stepped in to become a parent-figure to D.F. and Mother. Experts testified that the children would require years of ongoing counseling to learn to cope with the trauma and family dysfunction that they had endured. Their counselors also expressed concern that Mother had not provided the children with appropriate boundaries or structure in the home, and they were still learning to adapt to the rules and structure in their new environments.

{¶38} By the time of the permanent custody hearing, both children had been in the temporary custody of MCJFS for over two and a half years. At this juncture in the case, permanent custody was the only dispositional option available to the trial court. The court had found multiple reasons why the children could not or should not be returned to Mother's custody based on factors set forth in R.C. 2151.414(E), yet Mother does not challenge most of those findings on appeal. MCJFS had been unable to find any suitable friends or relatives who were willing and able to take legal custody of the children. Moreover, the trial court lacked authority to order any more extensions of temporary custody because this case was several months beyond the two-year sunset date. *See* R.C. 2151.415(D)(4).

{¶39} The evidence supported the trial court's conclusion that a legally secure permanent placement for H.F. and D.F. would be achieved by placing them in the permanent custody of

MCJFS. Mother has failed to demonstrate that the trial court lost its way by terminating parental rights and placing D.F. and H.F. in the permanent custody of MCJFS. *See Eastley* at ¶ 20. Mother's first assignment of error is overruled.

## ASSIGNMENT OF ERROR II

THE TRIAL COURT ERRED BY FINDING THE AGENCY USED REASONABLE EFFORTS TO REUNIFY APPELLANT MOTHER WITH HER MINOR CHILDREN.

{¶40} Mother's second assignment of error is that the trial court erred in finding that MCJFS had made reasonable reunification efforts in this case. Mother did not raise any argument about a lack of reasonable reunification efforts at the permanent custody hearing, however, and has failed to demonstrate that MCJFS was required to prove that it made reasonable efforts at that stage of the proceedings.

{¶41} R.C. 2151.419(A) specifically required MCJFS to establish reasonable efforts toward reunification or to prevent the continued removal of L.A. from the home:

> at any hearing held pursuant to section 2151.28 [shelter care], division (E) of section 2151.31 [ex parte emergency temporary custody], or section 2151.314 [shelter care placement], 2151.33 [pre-adjudication temporary placement], or 2151.353 [disposition following adjudication] of the Revised Code at which the court removes a child from the child's home or continues the removal of a child from the child's home[.]

R.C. 2151.419(A). *See also In re C.F.*, 113 Ohio St.3d 73, 2007-Ohio-1104, ¶ 43 (concluding that a reasonable efforts determination is necessary at a permanent custody hearing only if the agency has not demonstrated its use of reasonable efforts prior to that time). Mother does not argue that the trial court failed to make the requisite findings at those prior hearings or that the findings were not proper.

{¶42} Her primary argument is that MCJFS did not adequately tailor its case planning efforts to her unique situation in this case. Mother did not raise this issue at the permanent custody

hearing or at any other point during the trial court proceedings. Mother was represented by counsel throughout these proceedings. If she believed that the services offered by the existing case plans were not sufficient, her trial counsel could have objected to either of the two amended case plans, or filed proposed case plan amendments, but did not. *See* R.C. 2151.412(F)(2); *In re L.A.*, 9th Dist. Summit No. 30572, 2023-Ohio-1877, ¶ 10-11.

**{¶43}** Moreover, it was Mother's failure to consistently engage in case plan services, not any shortcoming by the agency, that caused some of the problems with her reunification services that she alleges on appeal. For example, Mother asserts that her most recent counselor was not provided with necessary background information about Mother, such as her history as the victim and perpetrator of domestic violence. Mother's prior counselor, who worked with Mother for well over one year, had accepted a promotion and planned to assign Mother to another counselor at the same agency. The former counselor had scheduled two full appointments to meet with Mother and the new counselor to introduce them and facilitate the transition. Mother missed both those appointments, so the new counselor apparently received Mother's background information directly from her at their first appointment together. Mother had shared information about her domestic violence history with the prior counselor and had been working on those specific problems for well over a year. Mother had the opportunity to fully inform her new counselor about her relevant history, but apparently did not do so.

**{¶44}** For all these reasons, Mother's second assignment of error is overruled.

### III.

**{¶45}** Mother's assignments of error are overruled. The judgment of the Medina County Court of Common Pleas, Juvenile Division, is affirmed.

Judgment affirmed.

—

There were reasonable grounds for this appeal.

We order that a special mandate issue out of this Court, directing the Court of Common Pleas, County of Medina, State of Ohio, to carry this judgment into execution. A certified copy of this journal entry shall constitute the mandate, pursuant to App.R. 27.

Immediately upon the filing hereof, this document shall constitute the journal entry of judgment, and it shall be file stamped by the Clerk of the Court of Appeals at which time the period for review shall begin to run. App.R. 22(C). The Clerk of the Court of Appeals is instructed to mail a notice of entry of this judgment to the parties and to make a notation of the mailing in the docket, pursuant to App.R. 30.

Costs taxed to Appellant.

BETTY SUTTON
FOR THE COURT

CARR, J.
CONCURS.

FLAGG LANZINGER, J.
CONCURRING.

{¶46} I concur in the majority opinion because I agree that Mother did not properly challenge whether the agency employed reasonable reunification efforts in this case. I write separately to express my concern that, after Mother's low level of intellectual functioning was identified, the agency did not provide her with reunification services that were designed to work

with her at her level of understanding. *See, e.g., In re H.S.*, 9th Dist. Summit Nos. 28944 and 28948, 2018-Ohio-3360, ¶ 19-21 (addressing the requirement in that case that the parents be provided with such services). Perhaps those efforts would not have been successful in this case, but the record fails to reveal that such services were even explored.

{¶47} Mother, an adult woman who has the reasoning ability of a child, was unfairly faulted for continually choosing to associate with criminal and sexually abusive men. Rather than Mother selecting her adult companions, I believe that it is more likely that these men preyed upon Mother, who has been victimized her entire life because she does not know how to protect herself. Without a case plan designed to account for her low level of cognitive functioning and her life-long history as a victim of abuse, Mother was unrealistically expected to break out of this cycle.

APPEARANCES:

PAUL GRANT, Attorney at Law, for Appellant.

MELISSA ZAWADZKI, Attorney at Law, for Appellee.

YU MI KIM-REYNOLDS, Attorney at Law, for H.F.

DAVID V. GEDROCK, Guardian ad Litem.